I hereby pronounce this case on the docket 2-14-1106, Jose Renteria v. Lincoln Appellate, the Edward Health & Community Services Corporation, and the name of this IPF ventures, who in business as many of them as possible remember. Defendants Appellees. Arguing on behalf of Lincoln Appellate, Mr. Daniel E. Conklin. Arguing on behalf of Defendants Appellees, Mr. Garrett L. Benny Jr. Thank you. Mr. Conklin. Thank you for agreeing to hear a oral argument in what I think is an extremely interesting case. It is hard to win a malpractice case in Illinois or anywhere. It's even harder in DuPage County. And it's almost impossible with prejudice, and I think that's what happened here. I would like to touch on three issues, not necessarily in order that they're in the brief, but I think in order after review of what I think struck me in preparation, and I know you'll interrupt me with any questions, but the first observation I made was that during the cross-examination of Dr. Nemeroff, I asked him what laying on the arm cause, which combined with other causes that he testified about, would produce the injury complaint. Well, that's 1501, the Proximate Cause Instruction. Then I asked him, Doctor, even if we believe all of your opinions, isn't it true that the cocaine and the substance abuse and all these problems are just conditions that Mr. Renteria walked into the hospital with that made him more susceptible to injury? And Dr. Nemeroff said yes. Now, that is the equivalent of Dr. Nemeroff coming in front of the jury and saying, my opinions deal neither with liability or with damages, because he just testified exactly to the 30.21 instruction. Now, that's hugely important because when you look at the pleadings and the status of how this case went to the jury, the defendant didn't argue, nor did they submit a 1205 instruction, that the sole proximate cause of the damages in this case were Mr. Renteria's polysubstance abuse or his cocaine use, and they didn't have an affirmative defense of comparative negligence. So without an argument that somehow Dr. Nemeroff's opinions, even if this panel thinks there was foundation for them, but without any of those pleadings in place or those arguments made, his testimony proved no issue that the jury had to decide in this case. And therefore, even if he did have foundation, they injected drugs into this case when the use of those drugs proved nothing on liability and damages. Now, the appellee's brief made an interesting point, and I'd like to deal with that before I move on. The appellee's brief said, wait a minute, wait a minute, we get to talk about, hang on, I'll find it, voluntary acts and negligence. That's why Dr. Nemeroff's opinion was relevant and material. Now, I think that, and recidivist is hard enough, without confusing yourself, the more I read, the less I realized I understood. But I think after reading the trial court's comments and reading the appellee's brief, the idea seems to be that when there's a res ipsa count pled, it's Katie bar the door for the defense on theories of what might have caused these damages. But I think the case law seems clear that it can't be speculation. What happens when you're on your way to look up one thing and you find another happened to me yesterday when I looked at the case of Dieback v. Weber, which is cited in our brief for the issue of speculation by an expert. And Dieback, the Supreme Court made a very interesting point, and that is on page 238 of its opinion. It looked at Elvis v. Rybar and said, you know what, there used to be three elements to a res ipsa count. One of those elements was the plaintiff proving freedom from comparative negligence. And the Dieback court said, hey, even though the appellate court didn't really say much about it, it was something they decided on. It wasn't an issue the parties were arguing, but we're going to talk about it anyway. And so Dieback said, though the question hadn't been raised in trial, one of the elements for invoking res ipsa has been abrogated by this court's adoption of comparative negligence in Elvis v. Rybar. And they said, so the plaintiff doesn't have to prove freedom from comparative negligence anymore. So it's inaccurate to say that the defense can come into our case and argue as an element that we haven't proved, for example, proximate cause. If this was an automobile accident and we had to prove proximate cause of damages, the defense could put a witness on and say you've proved no proximate cause. In this case, however, without a pleading of comparative negligence and without a 1205 instruction, this introduction of the 7th is still on an issue that they haven't raised, nor did we. Now, the reason that it's so terrible is because, and I scoured cases in Illinois to try to find something on point on the prejudice. And I had to go back to the cases citing the either use or impairment of alcohol. And as we all know, they couldn't have come into court and said, Mr. Renteria drank a couple of beers before he came to the hospital. Because all of us would say, yes, so are you proving the next step, impairment from the alcohol? In this case, the impairment that the defense was arguing was an impairment in his circulation sufficient to cause compartment syndrome. And as you saw on the record, compartment syndrome starts with a trauma or pressure on a muscle compartment. There's swelling, the muscle is forced and swollen against the fascia, it eliminates blood flow, the muscle dies. And that's the injury in this case because he laid on his arm for hours and hours and hours. Counsel, I have a question or two. Certainly. This is the first case that I recall where compartment syndrome was reported or involved in a case. I wish I could have found something for your honor. Well, the point I'm getting at is that what I got out of this was that if you lay on your arm long enough, you can get compartment syndrome. Is that correct? That's correct. Can you get compartment syndrome if for some reason there is an inflammation caused by a bee sting or something else that apparently inflames the limb to the extent that it will cut off circulation? Does a tourniquet to prevent a snake bite result in compartment syndrome? In order to determine that there's malpractice, it would seem that there would have to be some standard for dealing with this type of problem. And I'm at a loss to know what a benchmark is to determine what is appropriate or standard procedure. I was thinking that maybe bed sores and compartment syndrome are similar because they seem to have something to do with laying on something or having some pressure placed upon a part of the body which results in ulcers and blood flow problems. Is that a correct assumption or conclusion? It is correct. There are, for example, Dr. Carlson said, if we keep a tourniquet on for an hour or an hour and a half, we start to worry about compartment syndrome. Which is why we had Nurse Levin as our expert witness say, look, when someone's lying in one place for hours and hours and hours, you have to move them, you have to check them. And I think the evidence was clear. If someone went in and just poked Mr. Renteria and said, hey, wake up, he would have rolled off the arm and opened up the blood vessels to circulation. Which is why speculation about cocaine use before he was admitted to the hospital is so terribly, terribly prejudicial because Dr. Nemeroff could not, first of all, he never treated anybody with compartment syndrome. He never heard of a case where cocaine caused compartment syndrome. His entire, I'm sorry, Your Honor, did you have a question? Yes. But your own standard of care witness testified that cocaine and alcohol could cause vasoconstriction, which then causes the compartment syndrome. Or is a contributing cause to it? Could be a contributing cause. And I go back to my argument earlier. All of those things, well, let me take a step back because saying, for example, alcohol or cocaine could be a contributing cause assumes a certain amount of alcohol and cocaine. The test in this case tested for cocaine metabolites, which means the cocaine was gone. The substance that was left was the breakdown of the cocaine. I think the point is the extended use of cocaine is what causes vascular deterioration, not a one-time use. Well. Isn't that the reasonable assumption to be made from that testimony? No, I don't think so, because he couldn't point to, when we went back again and again and again, what are you talking about? Have you found one thing in the record that points to any issue with vasoconstriction? And I asked him numerous times, did you find anything, when you scoured the medical records, that showed you that this vasoconstriction was at work? Heart problems, high blood pressure, lymphedemia, not even varicose veins. Dr. Nemeroff, the problem was, never made a switch from the theoretical to the actual. And in the cases cited in my brief, if you look at the appellate court's reasoning in Gillen v. Collegecraft in coffee and in Simmers v. Bickers, what you find is that those experts well qualified to say, for example, in Collegecraft, there was a toxicologist that said these vapors can cause you to pass out. And the second district there said, yeah, but show us where in this case there's a concentration sufficient to cause this to happen. In Coffee v. Brodsky, the theoretical was inflammation could cause the adhesion of the peritoneum to an adjoining ligament. And the appellate court said, yeah, it can, theoretically. Where is it in this case? And then finally in Simmers, the theoretical was the expert, and no one argued in any of these cases that the expert wasn't allowed to say theoretically what might happen. But in Simmers v. Bickers, the expert said, well, I think this bacteria was passed into the eye, and that's what caused the plaintiff's damages. And the appellate court said, we might agree with you in general, theoretically, bacteria in your eye could cause these damages. Where is it in this case? So apropos to your honors question, in this case, the testimony is that from Mr. Renteria, and we're putting quite a predicament by what we think is the trial courts allowing the speculation, because if you look at the record, you say, well, is there any kind of limit on when you talk about this? And while there was a lot of talk about cocaine use, there wasn't ever any talk that looked in Mr. Renteria with his history. Here's what we found, high blood pressure from long-term drug use because of vasoconstriction. Here's what we found, heart trouble. Here's what we found, varicose veins, lymphedemia, anything. And Dr. Nemiroff said, you know, we just don't know. So it was the equivalent in an automobile accident of an expert coming in and saying, the plaintiff had a beer in the past, and I believe that's what caused the accident because alcohol can dull your senses. But then we say, well, when did he have this beer, and how much did he have, and what proof do you have? We acknowledge alcohol can dull your senses. But you're here today in front of a jury, and you're talking about heroin. You're talking about injecting cocaine. You're talking about polysubstance abuse. And we're saying, well, that's pretty prejudicial stuff. If you can't tie it up to Mr. Renteria, if you can't tie it up to this big old stack of medical records we have, and Dr. Nemiroff could do none of it. Now, if we back up one step and say, Dr. Nemiroff, what do you know about compartment syndrome? He said, well, I read a little bit about compartment syndrome. That was the extent of his qualifications. Was there ever any agreement or testimony on one side as to when someone is lying on a particular part of their body that it takes a minimum amount of time for the syndrome to appear? I think that testimony was between an hour and two hours, three hours, Your Honor. There was some variance, yes. That would mean that people would have to come into every bedroom and make sure that everybody turned over every one to three hours, depending on what a particular hospital decides is the standard of care for its policy purposes, to prevent compartment syndrome from arising. Is that correct? Well, it would if compartment syndrome was something that someone could just come up with resting on their back. In this particular case, he laid in a very specific position on his arm, and that's what Dr. Carlson said, because he found the discoloration on his arm for hours and hours and hours. And they were checking every 15 minutes anyway, so it would not have caused all hospitals everywhere to change their procedure. He was being checked, but he wasn't being followed well enough. He wasn't being reassessed. It would be the same in any hospital if you cruised by a patient's room, looked in, went on your way without an assessor. The point is that if they're not watching him constantly, they don't know what position he's in. And if they don't know what position he's in constantly, then they don't know whether or not making the person turn or go someplace else on their body is actually sending them back to the position they were in for the last 45 or 50 minutes. So I'm trying to come up with what should have been done in order to determine whether or not there was a breach. And I'm having difficulty coming up with a formula that seems reasonable under the circumstances, because compartment syndrome sounds like it should happen quite often, unless, of course, people wake up because they feel that whatever part of their body they're lying on has fallen asleep or has given them some strange sensations. But when you say they should come in and they should tap him and make him move, I don't necessarily see that as resolving the problem or preventing it. So I'm trying to come up with some solution whereby if there is a duty to be foreseen, what or how is one to reasonably prevent such a malady from occurring? And I'd appreciate it if you could tell me something more than just tapping them every hour or every three hours or two hours to see to it that they move. Well, here's apropos to your question about bed sores, and I think we can agree that bed sores come from failing to change positions for a long time. So the question would be, Mr. Compton, are you telling me that every nurse at every hospital in every room has to move all those patients every time? And my answer would be no, because we know the risk factors for bed sores. In this particular case, as Nurse Levin testified, Mr. Renteria was going downhill. He'd been sent to the hospital the evening before. He'd been sent to the hospital for flu-like symptoms. They put him in isolation, and they put him on a 15-minute watch. So the issue isn't are we going to have to supervise everyone. The issue is for Mr. Renteria, should they have been alerted, should they have changed their plan of care? And both nursing experts says that part of the nursing standard of care is to take into account the patient's condition and reassess. So if a patient is sick with flu-like symptoms and if in your 15-minute watches you see he's laying in the same position, at some point you disturb him. At some point you say, it's time for your medicine, it's time for your meal, it's time for something. At what point? At what point do you disturb him? Well, in this case, that would be up to the judgment of the nurse. We had Barbara Levin say there were meds that needed to be passed, there was meals that were passed, there was counseling that was passed. What about vital signs? How often were they taken and were they to be taken? Well, there was testimony from Nurse Levin and the other nurses that the vital signs were to be taken twice a day. And you know what, I thank you for bringing that up because the nurses at Edwards didn't take his vital signs until they found him nonresponsive. And so his vital signs were taken in the morning. Then he wasn't aroused for meals, he wasn't aroused for counseling, he wasn't aroused for vital signs. And they said, well, we met the standard of care by taking his vital signs the second time at 10.30 or a quarter to 11 when he needed to be rushed to the emergency room. So they had many opportunities that were, to answer your question, Justice McLaren, were not dependent on them looking out for compartment syndrome. Your time's up, sir. Thank you. Thank you. Mr. Ball, you may proceed. Good morning. May it please the court. My name is Garrett Bain. I'm here on behalf of athletes today. The judgment below the jury's verdict should be affirmed for two reasons. The first reason is that there is no error related to the standard of care testimony that was given before the jury. That standard of care testimony is unopposed, and there is no way for this court to determine that the jury did not find that there was no deviation from the standard of care. Second, the trial court did not abuse its discretion when it allowed Dr. Nemiroff's expert testimony with regard to compartment syndrome and the other causes of compartment syndrome. I'll take the first issue first. In order to get to the issues of causation evidence, the plaintiff had to pass an evidentiary hurdle, and that evidentiary hurdle was that the Linden Oaks nurses deviated from the standard of care. This was an expert versus expert situation. Nurse Levin on one side and Nurse Johnson on the other. There was certainly a dispute as to what the standard of care required. Nurse Johnson opined that the standard of care for assessments at a psychiatric facility was different from that of a general medical facility. So at a psychiatric facility, when someone was on a 15-minute watch, what did the testimony reveal should be done every 15 minutes? I believe the testimony revealed that there did not need to be any movement of, for instance, Mr. Renteria in this case, but a determination that he was there, that he was lucid. So there was a testimony, for instance, from Mr. Russo that he spoke to Mr. Renteria in those 15-minute intervals. Yes, but that wasn't charted, was it? It was not charted, no. It was charted by exception. That was not charted. It was not charted, absolutely not. So what you have is the testimony of the behavioral health assistant, Mr. Russo, as well as the nurses, as to what they did in those 15-minute intervals. And that's despite the fact that, so you said to check to see that he was lucid, but that was done via the conversation that wasn't recorded. Correct. And that's despite his being to the hospital twice in 12 hours or so, once at night and once in the morning. On the 10th and then the 11th, correct. Right. Correct. So then besides the one conversation that Mr. Russo had, what else did the testimony show was done? The testimony in Mr. Russo's testimony showed that he talked to Mr. Renteria at dinnertime, which was around 6 o'clock, I believe, asked him if he wanted to eat. He said no, he didn't want to. And there was testimony that in hours subsequent to that time that he, Mr. Russo, would step in the room, see how he was doing. And it was not, certainly it was not charted, but there were those checks at those 15-minute intervals. And Ms. Johnson, you know, provided her testimony that based upon her experience that the actions taken by the behavioral health assistant as well as the nurses satisfied the standard of care, that there was no deviation, that they did what they were supposed to do. And the jury certainly could have accepted that. But there was a medical issue involved here, too. I mean, he'd been to the hospital not for, he was at a psychiatric facility, but had been taken to the hospital twice for medical issues, correct? Correct. And he'd been released by the hospital, medical hospital. Right. So still nothing else was done besides what Mr. Russo testified to. Well, there was also a testimony from Nurse Peacock, and it was, the other nurse's name is now escaping me, but there was. That wasn't charted either, was it? No, it was not charted. It was charted by a session. Is that unusual, that something like that wouldn't be charted? I mean, all of a sudden we have someone on a 15-minute watch who's been to the hospital twice, and nobody's charting? I don't believe it was unusual in a psychiatric facility, and that was what was testified to by Nurse Johnson. And why would that not be unusual in a psychiatric facility? Because she said it was not required under the standard of care that it was charted by exception. It simply had to abide by the standard of doing those 15-minute check-in intervals. It did not require a notation on the chart. Is there something in a psychiatric facility, was there any testimony about how long you can let somebody sleep before you're concerned about whether they're sleeping too long? There was testimony as to, I believe it was by Dr. Nemeroff, by Nurse Johnson, that someone sleeping for eight hours was not particularly unusual in a psychiatric facility, especially someone that was suffering from bipolar syndrome. And it was not something that caused alarm. It was not on any medication. Excuse me, he wasn't on any medication at that time, was he? On the 11th, he was not on psychiatric medication, psychotropic medication on the 11th. So what would be the reason that somebody would be sleeping that long if they're not on psychotropic medication? How would bipolar disease contribute to, without medication, contribute to that? Was there any testimony regarding that? I'm sorry, Your Honor, I would have to check the record on that. I don't have a clear recollection as to that specific question. So returning to what is essentially the two-issue rule, the jury certainly was well within its bounds to determine that there was no deviation from the standard of care. Could this have been tested? Certainly. It could have been tested by a special interrogatory. Was it? No, it wasn't. And so it's impossible for this court to determine what the jury's deliberations involved. Did the jury decide? There's been no deviation from the standard of care. We can't tell. And because we can't tell, there is no means to get to the second issue, which is causation. Accordingly, the jury's verdict should be affirmed. There have been, there were, obviously there was quite a bit of discussion and questions with regard to how compartment syndrome may develop associated with the causation evidence that was given by Dr. Amaroff. This was somewhat of a strange case in that it involved res ipsa. So, and why did it involve res ipsa? Well, it involved res ipsa because the plaintiff didn't have the necessary proximate cause evidence, direct proximate cause evidence, that compartment syndrome was caused by a deviation of the standard of care by the nurses. In other words, Dr. Obsi did not testify as to direct proximate cause. Dr. Carlson did not testify as to direct proximate cause. And Nurse Levin was not a causation expert. So there was a reliance upon the circumstantial evidence aspect of the res ipsa doctrine. And without that, a plaintiff's case fell apart. Now, when res ipsa is involved, what can the defense do? The defense then can, just like any other evidence, can come in with rebuttal evidence. And that is what the defense did here via Dr. Amaroff, via Dr. Carlson, who said, yeah, compartment syndrome can occur in the absence of negligence. So there was plenty of evidence on the defense side of the equation as to other causes of compartment syndrome in the specific circumstance. When this syndrome occurs, are there any symptoms that would tell a normal, sentient human who isn't bipolar that there is something wrong with the area that is under compression? I think the testimony was that, you know, for instance, if you're sleeping on your arm for a period of time, you might wake up and it's fallen asleep and it's tingling. So that is, I believe, my reflection is that was kind of the beginning of the compartment syndrome type of condition, that tingling in your arm, so you shake it to return the circulation to your arm. Are there also signs of redness? Yes, and that was testified to by Dr. Carlson. In his testimony, he said when Mr. Renteria came into the medical facility that he noticed that redness. Is that what causes crossing your legs to give a red mark on the leg where it comes in contact with the other one? It could be. There's certainly no testimony in this case about that, but that sounds reasonable to me. But Dr. Carlson indicated, you know, he may have been laying on his arm for an hour, but he couldn't tell us the amount of time that he may have been laying on his arm that produced those red marks on his arm and his side. Just a moment. There are some questions with regard to whether bed sores have some analogy to compartment syndrome, and I would say the difference there is that bed sores are foreseeable, but compartment syndrome is not foreseeable, and there was no testimony in this case of its foreseeability. Unless there are further questions, I don't believe I have anything else to add, and I would ask that this Court affirm the jury's verdict. Thank you. Thank you.  Thank you, Your Honor. I appreciate Justice Zeno's questioning because I think maybe something I neglected to talk about in my brief was that this was otherwise a very close case with a lot of very contested issues. Aren't those issues, though, to be resolved by the jury? Well, here's why that is important, that Nemerov was allowed to do what he was allowed to do, because it would be like me trying to convince you on the actual issues, Nurse Levin versus Nurse Johnson, with Dr. Nemerov in the corner shouting cocaine. If you were to count, you would find counsel for the defendant talked about cocaine perhaps a dozen times in her opening, maybe a dozen times in her closing. Every witness was asked about injecting drugs, injecting heroin. And on a close case like this, I don't think it's too much to ask to say, if you have actual issues, let's let a jury dispassionately decide those issues instead of injecting, pardon the pun, cocaine into a case where if any of you go back and say, all right, how did that cocaine… …in the first couple days end up with compartments in him just in his arm? And that's why Dr. Nemerov had to admit while he was laying on his arm, he didn't disagree with Dr. Carlson. And that's, if you go to those pages cited, you will see me ask him exactly that question. Dr. Nemerov, you don't disagree with Dr. Carlson that Mr. Renteria laying on his arm was what brought about the compartment syndrome. Oh, no, I don't disagree with that. You're just telling us that all this drug stuff is a preexisting condition that made him more susceptible. Yes, that's exactly what I'm saying. Well, that doesn't have anything to do with liability and damages per Illinois law. So when we have good, solid issues about which reasonable jurors can disagree, I think it's incumbent on the trial court and on this tribunal to say, has there been a sufficient nexus between the theoretical, yeah, drug use could cause compartment syndrome, and the actual in this case. I don't think he said it caused it. No one ever said that drug use causes this. It makes him more susceptible. Not to split hairs, but that is somewhat of a difference. It is a difference. And the reason that difference is huge is the jury is given an instruction that they aren't to reduce or deny damages if Mr. Renteria went into the hospital with a condition that made him more susceptible to injury. So my question is, if Dr. Nemiroff's testimony, even if you accept foundation, which I do not, but even if you accept foundation, the jury has said, here, cocaine use is not a reason to limit or deny Mr. Renteria's damages, but we're going to talk about it for two weeks. And then we're going to, in closing arguments, say, before you give Mr. Renteria $3 million, you've got to think about the fact that he does cocaine and alcohol. And you're like, my goodness gracious, this could not have been more permeated by error that is without foundation when it otherwise could have been a fair trial on the issues. And Justice McLaren, you were asking good questions. Those are all questions that the jury could consider. But we're entitled to a dispassionate jury, not a jury that's thinking, I heard about Renteria, the coke addict, injecting heroin. Well, if we give him money, what's he going to do with it? That if you go through that transcript, it is lousy with prejudice on, as you pointed out, Justice Jorgensen, an issue which should neither limit or deny his right to damages under the Illinois jury instructions. Now, we might be talking about something different if they had tendered a 1205 instruction. But if you find that the sole proximate cause of his damages was something other than the negligence of the defendant, you are defined for the defendant. They didn't tender that instruction. They didn't have an affirmative defense. That's why, may I just, I've got one sentence I can say in a breath. That's why if you are to go back and think about this case and say, what special interrogatory could have weeded this out? And the answer is none, because all there is is a complaint and a denial of liability. There is not an affirmative defense in this case at all. Thank you. The case will be taken under advisement. There are other cases on the court call, but they're, I believe, several hours away.